UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

CIVIL ACTION NO.: 5:10-cv-00390-KSF

BUDSGUNSHOP.COM, LLC                                                              PLAINTIFF

V.                                    **OPINION & ORDER**

SECURITY SAFE OUTLET, INC., and
MATTHEW DENNINGHOFF                                                   DEFENDANTS

* * * * * * * *

This matter is before the Court on the Motion filed by Defendant, Security Safe Outlet, Inc.

("SSO") for leave to file an amended counterclaim against Plaintiff, Budsgunshop.com, LLC

("BGS") and a third-party complaint against Marion E. Wells, Jr. ("Wells") and Rex McClanahan

("McClanahan") [DE #62].  The motion having been fully briefed, this matter is ripe for review.

**I.      FACTUAL BACKGROUND & PROCEDURAL HISTORY**

This action stems from allegations by BGS that Defendants SSO and Matthew Denninghoff

misappropriated BGS's trade secrets by improperly accessing BGS's customer database and

obtaining and using confidential customer information, including customer email addresses, for their

commercial benefit.  All parties agree that SSO was formed in June 2000 by Wells, with Wells as

the sole shareholder.  Under the name "Bud's Gun Shop," SSO operated a retail store in Paris,

Kentucky, selling security safes, firearms and related accessories.  According to SSO, beginning in

approximately 2003, SSO expanded its online business to sell firearms and related accessories

through the www.budsgunshop.com website.  SSO further alleges that McClanahan was hired by

SSO in October 2005 to oversee and improve the company's websites (both www.budsgunshop.com

and www.SecuritySafeOutlet.com) and SSO's online business.  However, according to BGS, McClanahan was hired by Wells as an independent contractor for one year in an effort to increase sales through SSO's underperforming website located at www.budsgunshop.com.  SSO disputes BGS's suggestion that Wells acted in his individual capacity in hiring McClanahan, as opposed to acting on behalf of SSO.

According to BGS, in 2006, Wells and McClanahan "began the process of spinning out the online business operations of SSO as a separate business entity" [DE # 69].  SSO now argues that it is this factual allegation by BGS that forms the basis of SSO's proposed third-party claims against Wells for conversion, breach of fiduciary duty and diverting SSO's corporate assets and opportunity, as well as its third-party claims against McClanahan for aiding and abetting Wells's alleged misconduct.

In January 2007, Wells and Earley M. Johnson, II entered into a Stock Purchase Agreement whereby Johnson purchased a minority interest in SSO.  In May 2007, Wells and McClanahan officially formed BGS for the purpose of selling firearms and related goods over the internet. Specifically, on May 17, 2007, the Articles of Organization were filed with the Kentucky Secretary of State for Budsgunshop.com, LLC, naming Wells and McClanahan as sole members.  According to SSO, at the time Johnson executed the Stock Purchase Agreement in January 2007, he had no knowledge of Wells and McClanahan's prior preparations or intentions to create BGS.  SSO alleges that Wells did not inform Johnson of his intention to create BGS until after Johnson executed the Stock Purchase Agreement.  SSO further alleges that, after Johnson objected, Wells represented to Johnson that the formation of BGS would not change SSO's business operations, including SSO's use of the www.budsgunshop.com website.  In addition, SSO alleges that at no time prior to the

filing of this lawsuit did Wells or McClanahan inform Johnson that the www.budsgunshop.com website, the email database, or the business transacted through that website would be "spun off" to BGS.

Even after BGS was formed in May 2007, the business operations of BGS and SSO continued to overlap. Wells remained a majority shareholder, officer and director of SSO. According to SSO, BGS and SSO sold the same inventory and shared a computer server. SSO also states that sales made to some internet customers through the www.budsgunshop.com website were recorded as SSO sales and that BGS set up a terminal in SSO's Paris, Kentucky store so that BGS could continue to collect customer email addresses from SSO customers. According to SSO, BGS occasionally sent out email "blasts" to some of the customer email addresses on behalf of SSO. BGS and SSO also shared a building until January 2009, when BGS moved from the Paris store to a new space in Lexington, Kentucky. According to SSO, in early 2009, either McClanahan or Wells directed then-BGS employee Matthew Denninghoff to copy all customer information, including email addresses, from SSO's SINSO database in Paris to BGS's server in Lexington.

In April 2009, pursuant to a Stock Redemption Agreement entered into between Wells, SSO, Johnson and others, Johnson gained control of SSO through a buy-out of Wells's interest in the company. This Agreement contains a broad release provision, pursuant to which SSO and Johnson release Wells from any and all claims and liabilities "of whatever kind and nature, known and unknown, now existing or hereafter arising, which Releasors now have or have had or may have had or will have against [Wells], whether in law or equity, arising out of or related to any event(s) occurring on or prior to [April 30, 2009]" [DE #69-1]. However, SSO alleges that, both before and after the execution of the Stock Redemption Agreement, Wells misrepresented to SSO that BGS

3

would not engage in retail sales in competition with SSO and that Johnson executed this Agreement on the basis of that misrepresentation.

After this transaction, BGS and SSO continued to maintain a business relationship, pursuant to which BGS would use SSO as one of its suppliers to fulfill online orders. BGS states that, in order to obtain customer and order information necessary to fill specific orders, SSO was provided with limited access and limited authorization to BGS's computer network system. SSO disputes whether its access and authorization to BGS's computer network system was as "limited" as alleged by BGS.

SSO's access and authorization rights to BGS's computer network system are at the heart of BGS's claims against SSO. More specifically, as summarized by BGS, BGS's current pending claims relate primarily to its allegation that SSO and co-defendant Denninghoff misappropriated BGS's trade secrets by obtaining and using confidential customer information for their commercial benefit. According to BGS, Denninghoff, who was previously an employee of BGS, abruptly quit his job with BGS in January 2010 and began working with SSO. SSO's Vice-President is Denninghoff's sister, Jennifer Arnett. BGS alleges that, before quitting his job at BGS, Denninghoff erased all of the emails in work email account from BGS's email server and returned his work computer to BGS with the hard drive erased of all data and software other than the software that originally came with the computer. In April 2010, BGS states that it learned that SSO was launching an online presence for the purpose of selling firearms and related goods over the internet, thereby placing the two companies in direct competition. Upon learning this information, BGS terminated all access by SSO to BGS's computer network system. However, beginning in September 2010, SSO began sending mass emails to BGS's customers regarding its new competing firearms business.

4

BGS alleges that SSO was able to do so because Denninghoff secretly kept copies of BGS's highly confidential customer database in his possession after quitting his job at BGS and provided a copy of the database to SSO in August 2010.  SSO states that it used a September 2009 version of the customer email list - copies of which it alleges were routinely "backed-up" by BGS to SSO's server, even after BGS moved to Lexington - to prepare email blasts.  In this litigation, SSO has taken the position that, because SSO began the internet business and created the customer email database at issue, until BGS was created in May 2007, any customer email addresses gathered through either website could only belong to SSO.  Accordingly, SSO could not be liable for using these addresses. SSO further purports that, even after that date, any customer email addresses were used by and collected through the joint efforts of both parties.  BGS counters that SSO's internet business, including the customer email list, was transferred to BGS by Wells and McClanahan in 2007.  Thus, the rights to this intellectual property belong to BGS and, according to BGS, were misappropriated by SSO.

In its original complaint filed November 11, 2010, BGS alleged the following six counts: (1) violation of 18 U.S.C. § 1030(a)(2)(the "Computer Fraud and Abuse Act"); (2) violation of 18 U.S.C. § 1030(a)(4); (3) violation of 18 U.S.C. § 2701(a)(the "Stored Communications Act"); (4) violation of K.R.S. §§ 365.880, *et seq* (misappropriation of trade secrets); (5) violation of K.R.S. § 434.845 (unlawful access of computer); and (6) violation of K.R.S. § 434.855 (misuse of computer information) [DE #1].[1]  Defendants filed separate counterclaims, both claiming that any email

---

[1]BGS filed an amended complaint on November 30, 2010 [DE #6].  The amended complaint added no new claims, but instead corrected certain errors caused by conversion of the original complaint to PDF format and also included additional factual allegations regarding actions taken by Defendants after receiving the original complaint.

addresses used by SSO are the property of SSO and further asserting that BGS took no measures to maintain the confidentiality or proprietary nature of its computer data, that BGS "backed- up" its computer data on SSO's server and that BGS provided SSO with access to email addresses pursuant to the parties' order fulfillment arrangement [DE #12, 13]. In its original counterclaim, SSO brought claims against BGS for breach of contract (Count One), breach of trade name license for SSO trade names (Count Two), tortious interference with contractual rights (Count Three), violation of Anti-Cybersquatting Consumer Protection Act (Count Four), and trade mark and service mark infringement (Count Five) [DE #13].[2]

On November 23, 2011, the Court granted BGS's motion for leave to file a second amended complaint. BGS's second amended complaint voluntarily dismissed the claim for violation of the Stored Communications Act and brings the following additional claims: violation of the Lanham Act, 15 U.S.C. § 1125 (Count II); breach of contract - Tradename License (Count III); breach of fiduciary duty(Count IV); aiding and abetting breach of fiduciary duty (Count V); breach of contract - non-compete agreement(Count VI); and tortious interference with contract (Count VII).

On October 19, 2011 - prior to the Court's October 27, 2011 deadline to amend pleadings - SSO filed its motion for leave to file an amended counterclaim against BGS and a third-party complaint against Wells and McClanahan [DE #61]. As noted above, SSO argues that most of its new claims stem from BGS's allegation that Wells and McClanahan "spun-off" SSO's internet business, including the email database and the website www.budsgunshop.com to BGS beginning

---

[2]Denninghoff's counterclaim brought a claim for defamation and defamation per se against BGS, stemming from allegations that BGS sent a mass email to customers of BGS and SSO stating that BGS suspected that its "customer email database may have been compromised by former employees in an attempt to benefit their current employer...," purportedly referring to Denninghoff [DE #12].

6

in 2006.[3]  Specifically, SSO's proposed amended counterclaim/third-party complaint adds claims against BGS, Wells and McClanahan for conversion (Count Six), aiding and abetting conversion against McClanahan (Count Seven) and Wells (Count Eight), breach of fiduciary duty against Wells (Count Nine), diversion of corporate opportunity against Wells (Count Ten), and aiding and abetting breach of fiduciary duty against BGS and McClanahan (Count Eleven).  SSO also seeks to expand its breach of contract claim (Count One) to assert that claim against Wells and McClanahan, in addition to BGS.

In addition, SSO's proposed amended counterclaim/third-party complaint alleges that McClanahan improperly accessed email accounts belonging to and used by SSO.  According to SSO, McClanahan "logged on" to the email account used by SSO employee Jennifer Arnett by identifying himself as Arnett and then viewed SSO's communications with its suppliers and vendors, as well as its sales data and tax returns.  SSO further alleges that McClanahan forwarded that information to Wells, with instructions as to how he could access Arnett's emails himself. Based on these allegations, SSO brings claims against BGS, Wells and McClanahan for misappropriation of trade secrets in violation of KRS § 365.880 (Count Twelve) and unlawful access of a computer in violation of KRS § 434.845 (Count Thirteen).

---

[3]As SSO's own motion and proposed amended third-party complaint make clear, SSO is not alleging that it was never aware that Wells and McClanahan had created a new separate business entity to conduct online firearms sales.  Rather, SSO alleges that Johnson did not learn of Wells and McClanahan's intentions until *after* he acquired his minority interest in SSO in January 2007.  SSO further alleges that Johnson did not learn that the www.budsgunshop.com website, the email database or SSO's online business operations had been "spun-off" to BGS until after this lawsuit was filed.  Although SSO has been extremely critical of BGS's counsel's use of the term "spin-off" to describe how SSO's internet business was - for lack of a better term - spun-off from SSO to create BGS in 2007, the use of this term is in no way confusing to the Court and, in fact, appears to be a simple, accurate way to describe what happened here.

7

SSO's motion for leave to file an amended counterclaim and third-party complaint has been fully briefed and is ripe for review.

## II.   ANALYSIS

### A.   Standard

SSO's motion for leave to amend its counterclaim against BGS is governed by Federal Rule of Civil Procedure 15.  Under this rule, leave to amend a pleading shall be freely given when justice so requires.  Fed. R. Civ. P. 15(a).  The grant or denial of a motion to amend is within the sound discretion of the Court.  *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987).  A district court should consider the following factors in ruling on a party's motion to amend:  (1) undue delay in filing the motion; (2) lack of notice to adverse parties; (3) whether the movant is acting in bad faith, or with a dilatory motive; (4) failure to cure deficiencies by previous amendments; (5) the possibility of undue prejudice to adverse parties; and (6) whether the amendment is futile.  *Foman v. Davis*, 371 U.S. 178, 182 (1962);  *Robinson v. Michigan Consol. Gas Co.*, 918 F.2d 579, 591 (6th Cir. 1990).

However, the more stringent Rule 14 of the Federal Rules of Civil Procedure governs SSO's motion for leave to file its third-party complaint against Wells and McClanahan.  Under Rule 14, "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it."  Fed. R. Civ. Pro. 14(a)(1).  As explained by the Sixth Circuit:

> Third-party pleading is appropriate only where the third-party defendant's liability to the third-party plaintiff is dependent on the outcome of the main claim; one that merely arises out of the same set of facts does not allow a third-party defendant to be impleaded.  A defendant attempting to transfer the liability asserted against him by the original plaintiff to the third-party defendant is therefore the essential criterion of a third-party claim.  Correlatively, a defendant's claim against a third-party defendant cannot simply be an independent or related claim, but must be based upon

8

the original plaintiff's claim against the defendant. *See Stiber v. United States*, 60 F.R.D. 668, 670 (E.D.Pa.1973)("Under Rule 14, the liability of the third-party must be dependent on the outcome of the main claim."). Rule 14(a) does not allow a third-party complaint to be founded on a defendant's independent cause of action against a third-party defendant, even though arising out of the same occurrence underlying plaintiff's claim, because a third-party complaint must be founded on a third party's actual or potential liability to the defendant for all or part of the plaintiff's claim against the defendant. *United States v. Olavarrieta*, 812 F.2d 640, 643 (11ᵗʰ Cir.1987).

Underlying Rule 14 is a desire "to promote economy by avoiding the situation where a defendant has been adjudicated liable and then must bring a totally new action against a third party who may be liable to him for all or part of the original plaintiff's claim against him." 6 Wright, Miller, Kane, Fed. Prac. & Proc.: Civ.2d § 1441 at 289-90 (2d ed.1990). The third-party complaint is in the nature of an indemnity or contribution claim. Accordingly, it is rare that a court renders judgment in favor of the defendant or dismisses the underlying action but nonetheless chooses to address a third-party claim. Ultimately, a court has the discretion to dismiss a third-party claim after the original claims of the plaintiff have been settled, and relegate the third-party plaintiff to a separate suit. *Propps v. Weihe, Black & Jeffries*, 582 F.2d 1354, 1355 (4ᵗʰ Cir.1978). See also 6 Wright, Miller, Kane, Fed. Prac. & Proc.: Civ.2d § 1444 at 340-44 (2d ed.1990).

*American Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805-806 (6ᵗʰ Cir. 2008).

BGS argues that SSO's proposed claims against Wells and McClanahan do not meet this standard because they are not in the nature of an indemnity or contribution claim. Rather, according to BGS, SSO's proposed third-party claims are entirely independent of BGS's claims against SSO. In *Hall v. MLS Nat. Medical Evaluations, Inc.*, 2007 WL 1385943 (E.D.Ky. May 8, 2007)(unpublished), the court undertook a brief survey of the meaning of the terms "apportionment," "contribution" and "indemnity" under Kentucky law. As explained by the court in *Hall*:

According to Black's Law Dictionary, "apportionment of liability" is an umbrella term for "the parceling out of liability for an injury among multiple tortfeasors, and possibly the plaintiff as well." In Kentucky, "apportionment of liability arose from statutory provisions permitting contribution and several liability among joint tortfeasors in pari delicto." *Degener v. Hall Contracting Corp.*, 27 S.W.3d 775, 780 (Ky. 2000). "It has no application to the common law right of a constructively or

9

secondarily liable party to total indemnity from the primarily liable party with whom he/she is not in pari delicto." *Id.*

Contribution, under Kentucky law, is the specific "right of one who has discharged a common liability to recover of another also liable the aliquot portion which he ought to pay or bear." *St. Lewis v. Morrison*, 50 F.Supp. 570, 572 (W.D.Ky.1943). "The right of contribution of one tortfeasor against his co-wrongdoer is statutory[,]" and "the right exists where there [is] concurring or combined negligence causing the same injury." *Elpers v. Kimbel*, 366 S.W.2d 157, 161 (Ky.1963). Because contribution claims often require the "apportionment of causation between or among joint tortfeasors" on a pro rata basis, the right of contribution has been discussed by at least some Kentucky courts as "contribution and apportionment." *E.g., Degener*, 27 S.W.3d at 778-780.

Indemnity, on the other hand, "is simply the repayment to one party by another party who caused the loss, of such amounts the first party was compelled to pay." *Liberty Mut. Ins. Co. v. Louisville & Nashville R.R. Co.*, 455 S.W.2d 537, 541 (Ky.1970). "Unlike the right to contribution, the right to indemnity is of common law origin and is available to one exposed to liability because of the wrongful act of another with whom he/she is not in pari delicto." *Degener*, 27 S.W.3d at 780. Kentucky courts have held that both statutory contribution and common-law indemnity require underlying liability by a third-party defendant to an original claimant. *Thompson v. The Budd Co.*, 199 F.3d 799, 806-07 (6th Cir.1999)(citing, inter alia, *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 253 (Ky.1995), and *Poole Truck Line, Inc. v.. Commonwealth*, 892 S.W.2d 611, 614 (Ky.Ct.App.1995)).

*Hall*, 2007 WL 1385943 at *1-*2. Thus, "[t]he right to contribution arises when two or more joint tortfeasors are guilty of concurrent negligence of substantially the same character which converges to cause the plaintiff's damages.'" *Degener,* 27 S.W.3d at 778 (citations omitted). In contrast, "[a] claim for indemnity is 'one in which the claimant seeks restitution for damages it was required to pay for injuries sustained by another and which were entirely or primarily caused by the party against whom indemnity is sought.'" *Franke v. Ford Motor Co.*, 398 F.Supp.2d 833, 840 (W.D.Ky. 2005)(quoting *Degener*, 27 S.W.3d at 781-82).

BGS argues that SSO's proposed third-party claims are neither express indemnity nor contribution claims, nor are they "in the nature of" indemnity or contribution claims. BGS argues

that SSO's proposed claims are not in the nature of contribution or apportionment claims because SSO does not even allege that Wells and McClanahan are joint tortfeasors.  Moreover, according to BGS, SSO's proposed claims are not indemnity claims because SSO does not seek damages arising out of any judgment that SSO may pay to BGS as a result of this case.  BGS argues that the injuries alleged by BGS in its complaint were caused by SSO and Denninghoff, not Wells and McClanahan. BGS further argues that, as Wells and McClanahan are the owners of BGS, SSO's assertion that Wells and McClanahan are liable to SSO for indemnity arising out of BGS's damages is absurd. Rather, according to BGS, SSO's proposed third-party claims are entirely independent of BGS's claims against SSO.  Accordingly, BGS argues that SSO's proposed third-party complaint does not meet the requirements of Rule 14.

In response, SSO argues that Rule 14 is not as limited as claimed by BGS.  SSO does not argue that its third-party claim is in the nature of a contribution claim.  Rather, it argues that its third-party claim is in the nature of an indemnity claim.  According to SSO's theory, if SSO is liable to BGS for misappropriating or wrongfully accessing the customer email list at issue, then that liability exists only because Wells, in breach of his fiduciary duties, purported to transfer the customer email list and the internet business away from SSO and to a competing entity and because McClanahan aided and abetted that wrongful act.  In other words, had Wells and McClanahan not spun off the online business operations of SSO to BGS in 2006-2007 (which SSO alleges was wrongful), then SSO would have been within its rights to use the customer email list in 2010.  Accordingly, SSO argues that its liability to BGS for misappropriating or wrongfully accessing the customer email list exists only because Wells and McClanahan allegedly wrongfully spun-off SSO's online business operations to BGS.  SSO argues that it is the allegedly wrongful spinning-off of SSO's online

11

business operations that forms the basis of its third-party claims of conversion, breach of fiduciary duty and diversion of corporate opportunity against Wells, as well as its claims of conversion, aiding and abetting conversion and aiding and abetting breach of fiduciary duty against McClanahan.

SSO argues that Rule 14 is satisfied where the third-party claims are derivative of and dependent upon the plaintiff's claims in the original action. SSO relies on *American Zurich Ins.*, arguing that the third-party complaint at issue in that case, which the Sixth Circuit characterized as "entirely proper" at the time it was filed, did not state an express claim for indemnity or contribution, but for negligence, breach of contract and breach of fiduciary duty.  According to SSO, those claims were "clearly derivative" of the original action and were dismissed only because the original action was settled.  However, SSO's characterization of the third-party complaint in *American Zurich Ins.* omits a critical detail - unlike the allegations in SSO's third-party complaint, the wording of the allegations in the third-party complaint in *American Zurich Ins.* expressly stated that the liability of the third-party defendant was contingent upon a finding that the defendant/third-party plaintiff was liable in the underlying action.  *American Zurich Ins.*, 512 F.3d at 803.[4]  Such limiting language made clear that, even in the absence of an express indemnity or contribution claim, the claims in the third-party complaint were "in the nature" of an indemnity claim.  In contrast, there is no such express limiting language present in the allegations made by SSO in its proposed third-party

---

[4]For example, the breach of fiduciary duty claim in the proposed third-party complaint in *American Zurich* read as follows: "*If* the Court finds Endorsement No. 17 to be valid and binding on Cooper Tire, Marsh breached its duty to act in Cooper Tire's best interests ... As a direct and proximate result of Marsh's failure to act in Cooper Tire's best interest and to procure an insurance program approved by Cooper Tire, Cooper Tire will be forced to fill in *potential* gaps in coverage between the layers of excess insurance coverage and pay for the defense of underlying products liability claims from its own assets."  *Id.* at 803 (emphasis in original).

complaint.

Regardless, although SSO's characterization of its proposed third-party claim may be a stretch, it arguably falls within Rule 14's requirement that the third-party claim be dependent upon the outcome of the main claim.  It is true that one of the purposes of Rule 14 is "to permit additional parties whose rights may be affected by the decision in the original action to be joined so as to expedite the final determination of the rights and liabilities of all the interested parties in one suit." *American Zurich Ins. Co.*, 512 F.3d at 805.  Given this purpose, the Court finds that it is better to err on the side of promoting judicial efficiency and permit SSO's third-party claims under Rule 14.

As the Court finds that SSO's proposed third-party claims for conversion, breach of fiduciary duty and diversion of corporate opportunity (including the related claims of aiding and abetting conversion and breach of fiduciary duty) are proper under Rule 14, then SSO's remaining proposed third-party claims against Wells and McClanahan (misappropriation of trade secrets in violation of KRS § 365.880 and unlawful access of a computer in violation of KRS § 434.845) are permissible under Federal Rule of Civil Procedure 18(a).  This Rule provides that "[a] party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as independent or alternative claims, as many claims as it has against an opposing party."  Fed. R. Civ. Pro. 18(a).  Thus, SSO's claims of misappropriation of trade secrets and unlawful access of a computer are also proper.

### B.      The Futility of SSO's Amended Counterclaim and Third-Party Complaint

BGS also objects that SSO's motion should be denied because SSO's proposed third-party claims and amended counterclaims are futile.  The futility of a proposed amended complaint is a factor to be considered by a court in ruling on a motion for leave to amend. *Foman*, 371 U.S. at 182. "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to

dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).  Similarly, in

determining whether to exercise its discretion and allow a third-party complaint to proceed, a court

may consider whether granting the motion for leave "would prejudice the plaintiff, unduly

complicate the trial, or would foster an obviously unmeritorious claim." *In re Yamaha Motor Corp.*

*Rhino ATV Products Liability Litigation*, 2009 WL 2241599 at *2 (W.D.Ky., July 24,

2009)(unpublished)(quoting *Trane U.S. Inc. v. Meehan*, 250 F.R.D. 319, 322 (N.D. Ohio 2008)).

       Contrary to SSO's suggestions, consideration of the futility of SSO's proposed claims does

not require the Court to undertake a summary judgment-like analysis, nor is it inappropriate for the

Court to consider affirmative defenses that are apparent from the face of SSO's proposed amended

counterclaim/third-party complaint.  Rather, as with a Rule 12(b)(6) motion to dismiss, the Court

must construe SSO's proposed amended complaint in the light most favorable to SSO, accept all of

the factual allegations as true, and determine whether SSO can prove no set of facts in support of its

claims that would entitle it to relief.  *Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601

F.3d 505, 512 (6th Cir. 2010).  To overcome a Rule 12(b)(6) dismissal, "the complaint's '[f]actual

allegations must be enough to raise a right to relief above the speculative level,' and 'state a claim

to relief that is plausible on its face.'" *Campbell v. BNSF Ry. Co.*, 600 F.3d 667, 677 (6th Cir.

2010)(citing *Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896, 903 (6th Cir. 2009)(quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007))(alterations in *Campbell*).  "Therefore, a

motion for dismissal pursuant to Rule 12(b)(6) will be granted if the facts as alleged are insufficient

to make a valid claim *or* if the claim shows on its face that relief is barred by an affirmative defense."

*Riverview Health Institute LLC*, 601 F.3d at 512 (emphasis added).

       With respect to affirmative defenses, as explained by the Sixth Circuit in *Riverview Health*

*Institute*, "[i]n a situation involving an affirmative defense, 'the claim is stated adequately..., but in addition to the claim the contents of the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim. In [such a] situation[ ] the complaint is said to have a built-in defense and is essentially self-defeating.'" *Id.*, quoting 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)(alterations in original). *See also Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6ᵗʰ Cir. 2009)("But there is no reason not to grant a motion to dismiss where the undisputed facts conclusively establish an affirmative defense as a matter of law.")(citations omitted). For example, courts have granted motions to dismiss under Rule 12(b)(6) where plaintiff's claims are defeated by various affirmative defenses, such as statutory preemption or the expiration of the statute of limitations. *See Riverview Health Institute LLC*, 601 F.3d at 519 (affirming district court's dismissal of plaintiff's federal RICO claims where those claims were reversed preempted in accordance with the McCarran-Ferguson Act, rejecting plaintiff's argument that the McCarran-Ferguson Act did not apply to its RICO claims); *Gibson v. American Bankers Ins. Co.*, 289 F.3d 943, 946 (6ᵗʰ Cir. 2002)("Dismissal of a complaint because it is barred by the statute of limitations is proper when 'the statement of the claim affirmatively shows that the plaintiff can prove *no* set of facts that would entitle him to relief.'")(quoting *Duncan v. Leeds*, 742 F.2d 989, 991 (6ᵗʰ Cir. 1984)(emphasis in original)). Similarly, courts have denied motions for leave to amend pleadings on futility grounds where the futility is based on a proposed claim's inability to overcome various potential affirmative defenses, including the presence of a contractual clause barring relief, the applicability statute of limitations or immunity. *Riverview Health Institute LLC*, 601 F.3d at 523 (affirming district court's denial of plaintiff's motion for leave to amend its complaint to add a federal estoppel claim under ERISA, as such a claim was barred by the unambiguous language of

15

defendant's health care certificates, and, accordingly, a grant of leave to amend would be futile); *Wells v. Bottling Group, LLC*, — F.Supp.2d —, 2011 WL 2292383 at *3 (E.D.Ky. 2011)(rejecting plaintiff's request to amend where the amendment would be futile because the statute of limitations would bar the "amended" claim); *Etapa v. Asset Acceptance Corp.*, 373 F.Supp.2d 687, 693 (E.D.Ky. 2004)(denying motion for leave to amend complaint on futility grounds based, in part, on proposed amendment's failure to overcome applicable immunity defenses).

       1.    <u>SSO's Proposed Conversion Claim against BGS, Wells and McClanahan (Count 6)</u>

In Count 6 of SSO's proposed amended counterclaim/third-party complaint, SSO brings a claim of conversion against the "Counterclaim Defendants," identified by SSO as BGS, Wells and McClanahan.  Specifically, SSO alleges that, from the date of its formation, SSO owned and controlled the www.budsgunshop.com website and all data pertaining to that website, including the email database; the SINSO data[5] stored on the SSO server located in Paris, Kentucky; and the www.SecuritySafeOutlet.com website and all data and electronic information stored within and pertaining to that website [DE #62-2].  SSO's proposed Count 6 alleges that BGS, Wells and McClanahan wrongfully converted each of these assets. [*Id*.].  Specifically, SSO alleges that, to the extent that BGS, Wells and McClanahan obtained possession and control of the www.budsgunshop.com website and all data pertaining to that website, then they did so by wrongful act or dispossession of this property, including, but not limited to, Wells's breach of his duties to SSO and the misrepresentations by BGS, Wells and McClanahan to SSO that BGS would not

---

     [5]Although the "SINSO data" is not defined by SSO, SSO's proposed amended counterclaim/third-party complaint does contain allegations that SSO's SINSO Point of Sale database included contact information (including email addresses) for more than 42,000 contacts, including customers and Federal Firearms License-holding firearm dealers [DE #62-2].

compete with SSO and that the creation of BGS would not alter SSO's ownership or use of the www.budsgunshop.com website.  SSO further alleges that BGS, Wells and McClanahan obtained possession and control of the SINSO data stored on the SSO server located in Paris, Kentucky, by directing then-BGS employee Denninghoff to copy the contents of SSO's SINSO database to a server owned by BGS and located in Lexington, Kentucky, without the knowledge or consent of SSO.  SSO also alleges that BGS, Wells and McClanahan obtained possession and control of the www.SecuritySafeOutlet.com website (as well as all data and electronic information stored within and pertaining to that website) by wrongful means, including breaching the Trade Name License for SSO Trade Names, refusing to return control of the www.SecuritySafeOutlet.com website to SSO, and refusing to return the data and electronic information stored within and pertaining to the website to SSO in native format.

BGS argues that SSO's conversion claim is futile because it is preempted by both federal copyright law and by state trade secret law.  However, even if the claim is not preempted, BGS argues that it is at least partially barred by Kentucky's two-year limitations period for conversion claims.  Each of these arguments will be examined in turn.

### a.   Preemption by Federal Copyright Law

Section 301 of the Copyright Act provides that

> On or after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103...whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).  Generally, Section 301 broadly preempts state law claims.  *Ritchie v. Williams*,

395 F.3d 283, 285-286 (6th Cir. 2005)("The Copyright Act is unusually broad in its assertion of federal authority.").  Indeed, "[r]ather than sharing jurisdiction with the state courts as is normally the case, the statute expressly withdraws from the state courts any jurisdiction to enforce the provisions of the Act and converts all state common or statutory law 'within the general scope of copyright' into federal law to be uniformly applied throughout the nation." *Id*. at 286.  According to the Sixth Circuit, Section 301 preempts a state law claim if: (1) the work comes within the scope of the "subject matter of copyright" as set forth in Sections 102 and 103 of the Copyright Act (the "subject matter requirement"); and (2) the rights granted under state law are equivalent to any of the exclusive rights within the scope of federal copyright protection (the "equivalency" requirement). *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004)(citations omitted).

With respect to the "subject matter" requirement of Section 301, Section 102 of the Copyright Act specifies that "[c]opyright protection subsists...in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device," including in works in the following categories: literary works; musical works; dramatic works; pantomimes and choreographic works; pictorial, graphic and sculptural works; motion pictures and other audiovisual works; sound records and architectural works.  17 U.S.C. §102(a).  Section 103 specifies that "compilations and derivative works" are included in the subject matter of copyright.  17 U.S.C. §103(a).  Section 301's "subject matter" requirement "is satisfied if a work fits within the general subject matter of Sections 102 and 103 of the Copyright Act, regardless of whether it qualifies for copyright protection." *Stromback*, 384 F.3d at 300.  *See also Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 455 (6th Cir. 2001)(for purposes of preemption, the scope of the

18

Copyright Act's subject matter is broader than the scope of its protection).  Thus, "a work need not consist entirely of copyrightable material in order to satisfy the subject matter requirement." *Integrative Nutrition, Inc. v. Academy of Healing Nutrition*, 476 F.Supp.2d 291, 296 (S.D.N.Y. 2007)(citations omitted).

Here, SSO's conversion claim centers on three items of property: (1) the www.budsgunshop.com website and all data pertaining to that website, including the email database; (2) the SINSO data stored on the SSO server located in Paris, Kentucky, which also includes contact information for customers and other dealers; and (3) the www.SecuritySafeOutlet.com website and all data and electronic information stored within and pertaining to that website.  With respect to the www.budsgunshop.com and www.SecuritySafeOutlet.com websites, BGS argues that the U.S. Copyright Office, courts and commentators have all recognized "websites, databases, data, and other electronic information to be within the scope of copyright law" [DE #69]  However, BGS does not point the Court to any authority holding that all websites are *necessarily* within the scope of copyright law, simply by virtue of being a website.  For example, as noted by BGS, the U.S. Copyright Office does provide information regarding copyright registration of "online works *made available* over a communications network such as the Internet," as well as "works *accessed* via network (websites, homepages, and FTP sites) and files and documents *transmitted and/or downloaded* via network."  U.S. Copyright Office, Circular 66, *Copyright Registration for Online Works* (2009)(emphasis added).  However, in response to the question "Can I copyright my website?," the website for the U.S. Copyright office also explains: "The original authorship appearing on a website may be protected by copyright.  This includes writings, artwork, photographs, and other forms of authorship protected by copyright.  Procedures for registering the contents of a

19

website may be found in Circular 66, *Copyright Registration for Online Works*."[6]  "FAQs -What Does Copyright Protect?," United States Copyright Office, accessed April 18, 2012, http://www.copyright.gov/help/faq/faq-protect.html#website.  Thus, it does not appear that websites are *per se* within the scope of the general subject matter of copyright.  Rather, content appearing on a website may be protected by copyright.  Accordingly, whether the websites at issue here fall within the scope of the general subject matter of copyright for purposes of Section 301 depends upon the content of those websites.  In this case, SSO's proposed amended counterclaim and third-party complaint alleges that the websites were used to sell firearms, safes and accessories and that customers could create accounts through the www.budsgunshop.com website.  Otherwise, no specific information regarding the content of the websites is provided.  As noted above, in order to satisfy Section 301's subject matter requirement, the websites need not consist entirely of copyrightable material.  *Integrative Nutrition, Inc.*, 476 F.Supp.2d at 296.  However, even with this principal in mind, at this point, there is insufficient information provided to make a determination that the websites consist of *any* copyrightable material, much less enough to bring the websites within the general subject matter of copyright as required by Section 301.

In its reply brief, SSO does not discuss whether websites fall within the general subject matter of copyright.  Rather, SSO focuses specifically on whether a customer email list is within the subject matter of copyright.  According to SSO, Section 102 is "universally understood to prohibit any copyright in facts" [DE #74].  SSO further relies on the United States Supreme Court's decision in *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 356 (1991), which, according to SSO, interprets this principle as placing a compilation of names and addresses outside

---

[6]This is the same circular cited by BGS.

of the subject matter of copyright [DE #74].   However, SSO's summary of *Feist* greatly oversimplifies the Supreme Court's holding.

In *Feist*, a telephone utility brought a copyright infringement action against a publisher of an area-wide telephone directory for use of listings from the utility's local white pages.   As explained by the Court, the *Feist* case "concerns the interaction of two well-established propositions.   The first is that facts are not copyrightable; the other, that compilations of facts generally are."   *Feist*, 499 U.S. at 344.   According to the Court, the law's seemingly disparate treatment of facts and factual compilations is mandated by the requirement that, to qualify for copyright protection, a work must be original to the author.   *Id*. at 345-347.   The Court described the "originality" requirement as follows:

> Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.   1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990) (hereinafter Nimmer).   To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.   The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be.   *Id*., § 1.08 [C] [1]. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.   To illustrate, assume that two poets, each ignorant of the other, compose identical poems.   Neither work is novel, yet both are original and, hence, copyrightable.   *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936).

*Id*. at 345-46.

As further explained by the Court, originality may not be claimed as to facts because facts are discovered, not created, and do not owe their origin to an act of authorship.   *Id*. at 347 (citations omitted).   In contrast, factual compilations may be original:

The compilation author typically chooses which facts to include, in what order to

21

place them, and how to arrange the collected data so that they may be used effectively by readers.  These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws.  Nimmer §§ 2.11[D], 3.03; Denicola, Copyright in Collections of Facts: A Theory for the Protection of Nonfiction Literary Works, 81 Colum.L.Rev. 516, 523, n. 38 (1981).  *Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.  See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 547 (1985).  Accord, Nimmer § 3.03.

*Id*. at 348 (emphasis added).  Thus, although facts are not original and may not be copyrighted, the presence of the following three elements in a work qualifies that work as a copyrightable compilation under Section 101: "(1) the collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement of an 'original' work of authorship."  *Id*. at 357.

As noted by the Court, the "originality" requirement is not particularly stringent and "requires only that the author make the selection or arrangement independently (*i.e.*, without copying that selection or arrangement from another work), and that it display some minimal level of creativity."  *Id*. at 358.  Although the Court surmised that the vast majority of compilations will pass this test, it noted that "[t]here remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent."  *Id.* at 358-59.  For example, after examining the directory at issue in *Feist*, the Court concluded that the telephone utility's white pages lacked the requisite originality and, therefore, the publisher's use of the listings did not constitute copyright infringement.  *Id*. at 364.  The Court noted that, in compiling its directory, the utility simply took the name, town and telephone number provided by its subscribers when they applied for a telephone number and listed it alphabetically by surname.  According to the Court, "[t]he end product is a

22

garden-variety white pages directory, devoid of even the slightest trace of creativity." *Id*. at 362. In addition, to the extent that the utility "arranged" the names alphabetically itself, "there is nothing remotely creative about arranging names alphabetically in a white pages directory." *Id.* at 363.

As with the websites, in this case, there is a dearth of specific information regarding the creation of the customer email lists at issue. Other than generally alleging that the SINSO data includes contact information for customers and other dealers, little is known about how this information was selected, coordinated or arranged. It is entirely possible that the information was collected, selected and arranged in such a way as to fall within the general scope of copyright as an "original" compilation. However, at this point, there is not sufficient information before the Court to enable it to make such a determination.

For all of these reasons, at this point in time, the Court does not have enough information regarding the content of the websites themselves or the SINSO data to evaluate whether the property that SSO alleges has been converted is "within the general scope" of copyright. Accordingly, it would be premature for the Court to rule on whether SSO's conversion claim is preempted by the Copyright Act. Rather, it appears that, as argued by SSO, such a determination may be more appropriate for a motion for summary judgment. As the Court cannot yet determine whether Section 301's "subject matter" requirement for preemption has been met, at this time, there is no need for the Court to further evaluate whether Section 301's "equivalency" requirement for preemption has been met.

          b.     <u>Preemption by Kentucky Uniform Trade Secret Act</u>

BGS also argues that, to the extent that SSO's conversion claim regards the email accounts associated with the www.SecuritySafeOutlet.com domain name, this portion of SSO's claim is

23

preempted by the Kentucky Uniform Trade Secrets Act ("KUTSA"), because the same allegedly converted information is also later alleged by SSO to be a misappropriated trade secret under KUTSA. "As part of the statutory scheme, KUTSA replaces all conflicting civil state law regarding misappropriation of trade secrets except for those relating to contractual remedies." *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 788 (W.D.Ky. 2001)(citations omitted). Specifically, KRS § 365.892 provides that KUTSA "replaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret," although KUTSA shall not affect contractual or criminal remedies, whether or not those remedies are based upon misappropriation of a trade secret, or other civil remedies that are not based upon misappropriation of a trade secret.  KRS § 365.892.

SSO argues that, in order for its conversion claim to be preempted by KUTSA, BGS, Wells and McClanahan must first show that the converted items did amount to trade secrets, which, according to SSO, BGS has made no attempt to do.  However, SSO overlooks that its own proposed amended counterclaim/third-party complaint alleges that Arnett's www.SecuritySafeOutlet.com email account contained confidential and proprietary information that qualifies as a trade secret [DE #62-2 at Count Twelve].  In addition, at least one court interpreting KUTSA has rejected such an approach in the preemption analysis stage, finding that "KUTSA replaces other law relating to the misappropriation of trade secrets, regardless of whether the Plaintiffs demonstrate that the information at issue qualifies as a trade secret." *Auto Channel, Inc.*, 144 F.Supp.2d at 789.  Even so, "KUTSA does not preempt all causes of action that have to do with trade secrets." *Id.*  Rather, following the example set by the courts in *Auto Channel, Inc.* and *T.D.I. Intern., Inc. v. Golf Preservations, Inc.*, 2008 WL 294531 at *5 (E.D.Ky. Jan. 31, 2008)(unpublished), this Court will

24

examine SSO's conversion claim with respect to the www.SecuritySafeOutlet.com website and determine whether it seeks a remedy for the misappropriation of trade secrets. If so, then KUTSA applies and SSO's claim is preempted.

Under Kentucky law, a conversion claim requires proof of seven elements: "(1) plaintiff has legal title to the converted property; (2) plaintiff had possession or the right to possession at the time of conversion; (3) defendant exercised dominion over the property, to defendant's use and enjoyment, such that plaintiff's right to use and enjoy the property was denied; (4) defendant intended to interfere with plaintiff's possession; (5) plaintiff made some demand for the property's return which defendant refused; (6) defendant's action caused plaintiff's loss of the property; and (7) plaintiff was damaged thereby." *Fastenal Co. v. Crawford*, 609 F.Supp.2d 650, 673 (E.D.Ky. 2009)(quoting *Ky. Ass'n of Counties v. McClendon*, 157 S.W.3d 626, 632 n. 12 (Ky.2005), quoting 90 C.J.S. Trover and Conversion § 4 (2004)). In its conversion claim, SSO alleges that BGS, Wells and McClanahan obtained possession and control of the www.SecuritySafeOutlet.com website and all data and electronic information stored within and pertaining to that website and refused to return that website and information to SSO in native format. Even though this data and information may have included trade secrets, SSO's conversion claim does not seek a remedy for the misappropriation of those trade secrets. Rather, it seeks a remedy for what it alleges is the wrongful assertion of control of its website and related data by BGS, Wells and McClanahan and the alleged subsequent refusal to return that control and information to SSO. As this claim alleges far more than the wrongful use of SSO's trade secrets, the Court finds that this portion of SSO's conversion claim is not preempted by KUTSA.

c.      Statute of Limitations

25

As discussed above, SSO's conversion claim essentially has three parts: (1) allegations of conversion of the www.budsgunshop.com website and related data; (2) allegations of conversion of the www.SecuritySafeOutlet.com website and related data; and (3) allegations of conversion of the SINSO data on the SSO server.   BGS argues that SSO's claims alleging conversion of the www.budsgunshop.com website and conversion of the SINSO data are barred by the two-year statute of limitations period for conversion claims provided by KRS § 413.125.   SSO does not dispute that the two-year limitations period provided by KRS § 413.125 applies to its conversion claims.   Rather, as explained below, SSO argues that questions of fact exist as to the date when the statute of limitations began to run.   Although Kentucky law sets the length of the statute of limitations, the date that the statute of limitations begins to run is established by federal law.   *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010)(citations omitted).   "Under federal law, as under most laws, the limitations clock starts ticking 'when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.'"   *Id*. (quoting *Noble v. Chrysler Motors Corp.*, 32 F3d 997, 1000 (6th Cir. 1994)).[7]

BGS filed its complaint in this case on November 11, 2011 [DE #1].   SSO filed its answer and original counterclaim in this case on January 6, 2011 [DE #13] and its motion for leave to file an amended counterclaim/third-party complaint on October 19, 2011 [DE #62].   In its proposed

---

[7]Similarly, under Kentucky law, the "discovery rule" provides that "a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only that he has been injured but also that his injury may have been caused by the defendant's conduct."   *Hazel v. General Motors Corp.*, 863 F.Supp. 435, 438 (W.D.Ky. 1994)(citations omitted).   Thus, both federal law and Kentucky law dictate that SSO's conversion claim accrued, for statute of limitations purposes, when SSO discovered, or in the exercise of reasonable diligence should have discovered, that it had been injured and that its injury may have been caused by BGS, Wells and McClanahan.

amended counterclaim/third-party complaint, SSO alleges that BGS, Wells and McClanahan wrongfully dispossessed SSO of the www.budsgunshop.com website by "spinning off" the website from SSO to BGS upon the creation of BGS in 2007 and, after then-minority interest holder Johnson learned of the creation of BGS after executing the January 1, 2007 Stock Purchase Agreement and objected, misrepresenting to SSO that BGS would not compete with SSO, nor would the formation of BGS change SSO's business operations, including altering SSO's ownership or use of the website [DE #62-2 at ¶ 25-31, 128].  With respect to the alleged conversion of the SINSO data, SSO alleges that BGS, Wells and McClanahan wrongfully dispossessed SSO of this property in "early 2009" by directing Denninghoff, then an employee of BGS to copy the contents of SSO's SINSO database to a server owned by BGS [*Id*. at ¶ 52, 129].

In response, SSO first generally argues that BGS has the burden of establishing a statute of limitations bar.  However, the face of SSO's proposed amended counterclaim/third-party complaint shows that its conversion claim with respect to the www.budsgunshop.com website accrued in 2007 and its claim with respect to the SINSO data in early 2009.  Thus, on the face of SSO's pleading filed on October 19, 2011, neither claim is timely.  When it is apparent from the face of the complaint that the time limit for bringing a claim has passed, an obligation to plead facts in avoidance of the statute of limitations is triggered.  *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 520 (6th Cir. 2008)(citing *Hoover v. Langston Equipment Associates, Inc.*, 958 F.2d 742, 744 (6th Cir. 1992)). Thus, "it is not true, when the face of the complaint affirmatively indicates that the time limit for bringing the claim has passed, that plaintiff may escape the statute by saying nothing." *Hoover*, 958 F.2d at 745.

SSO argues that BGS, McClanahan and Wells fraudulently concealed the alleged acts of

27

conversion by misrepresenting that BGS would not compete with its retail sales and failing to notify SSO that the internet business (together with the customer email list) had been "spun off." "If a plaintiff asserts fraudulent concealment as a basis for tolling, it must plead three elements: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *Hoover*, 958 F.2d at 745 n. 1 (quoting *Dayco Corp. v. Goodyear Tire and Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)). In such circumstances, "[p]laintiff's ignorance of its cause of action does not by itself satisfy the requirements of due diligence and will not toll the statute." *Hoover*, 958 F.2d at 744 (citations omitted). Rather, "[a]ny fact that should excite [the plaintiff's] suspicion is the same as actual knowledge of his entire claim." *Friedman v. Estate of Presser*, 929 F.2d 1151, 1160 (6th Cir. 1991)(quoting *Dayco Corp.*, 523 F.2d at 394).

As argued by BGS, SSO's proposed amended counterclaim/third-party complaint fails to allege facts suggesting that it could not have discovered, in the exercise of reasonable diligence, that BGS, Wells and McClanahan "converted" the www.budsgunshop.com website (a claim that notably requires that BGS, Wells and McClanahan exercised dominion over the website, such that SSO's right to use and enjoy the website was denied) prior to this lawsuit. Indeed, SSO has pled nothing to suggest that SSO ever conducted any due diligence regarding the ownership of the www.budsgunshop.com website. SSO's failure to undertake even a cursory examination of the ownership of the www.budsgunshop.com website is particularly noteworthy, given that, as early as 2007, it was aware of the creation and existence of an entity named Budsgunshop.com, LLC. Certainly, the creation of a separate entity using the name of the website that SSO now alleges it

thought it owned should have "excited SSO's suspicion" and put SSO on notice that the ownership of the www.budsgunshop.com website was at least an issue that they should look into further. This is particularly true, given that, during this time, the parties were engaged in contractual negotiations, including those surrounding the transfer in ownership of SSO from Wells to Johnson. In such circumstances, SSO's current bare allegations that it had no knowledge that the www.budsgunshop.com website had been "spun off" until this litigation are insufficient to toll the statute of limitations with respect to SSO's claim regarding the purported conversion of the www.budsgunshop.com website. "If a claimant were simply allowed to allege, unchallenged, any date as the time at which the limitations period began to run, courts would be unable to dismiss claims that were, from the record, obviously time-barred." *LRL Properties v. Portage Metro Housing Authority*, 55 F.3d 1097, 1107 at n.5 (6th Cir. 1995). Accordingly, SSO's claim regarding the conversion of the www.budsgunshop.com website is time-barred.

SSO further argues that, "the statute of limitations will not bar a counterclaim arising out of the basis of the plaintiff's suit, even if the plaintiff's original complaint and the defendant's counterclaims are based upon different theories of relief" [DE #74, p. 13, citing *Armstrong v. Logsdon*, 469 S.W.2d 342, 343 (Ky. 1917)]. However, to the extent that SSO is attempting to suggest that a defendant may, unrestricted, bring any counterclaim against the plaintiff, regardless of whether that claim is timely, so long as the counterclaim arises out of the basis of plaintiff's suit, SSO grossly mischaracterizes *Armstrong* and, in any event, is simply wrong. To the contrary, the court in *Armstrong* held that "in a tort action, if a claim of a defendant arising out of the same occurrence which is the basis of the plaintiff's claim *is not barred by limitation when the suit is brought*, it may be asserted by a pleading timely served in such suit even though the limitation period

29

has elapsed between the time of the commencement of the suit and the serving of the counterclaim."

*Armstrong*, 469 S.W.2d at 344 (emphasis added).[8]  This rule is in accord with Rule 15(c) of the

Federal Rules of Civil Procedure governing relation back of amendments, which provides:

> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed.R.Civ.Pro. 15(c).

Thus, the fact that SSO's claim regarding the conversion of the www.budsgunshop.com

website arises out of the basis of BGS's lawsuit does not save the claim if it was untimely when

BGS's lawsuit was filed.  BGS's lawsuit was filed on November 11, 2011.  Based on the facts

---

[8]Whether intentional or the result of negligence, SSO's mischaracterization of the holding in *Armstrong* is one of several instances in SSO's brief where the Court, upon closer examination of the cases cited by SSO, discovered that the holdings of those cases were not exactly as represented by SSO.  Often, the differences between SSO's summarized holdings and the actual holdings are significant.  At this point, the Court will chalk these misstatements up to simple carelessness in briefing.  However, the parties would be well served to review SCR 3.130(3.30), the Kentucky Rule of Professional Conduct requiring candor toward the tribunal.  Future transgressions will not be treated so lightly.

alleged by SSO, in the exercise of reasonable diligence, SSO should have discovered the basis for its conversion claim in 2007. Thus, the statute of limitations for this claim expired in 2009. Accordingly, SSO's claim regarding the conversion of the www.budsgunshop.com website is untimely and would not withstand a motion to dismiss. Because this portion of SSO's conversion claim would not withstand a motion to dismiss, SSO's motion for leave to amend its counterclaim and file a third-party complaint is denied to the extent that it seeks to add this claim.

With respect to SSO's claim that BGS, Wells and McClanahan "converted" the SINSO data, SSO alleges that this conduct occurred in "early 2009," although an exact date is not given. SSO argues that its counterclaims against BGS, including its claim regarding the conversion of the SINSO data, arise out of the events upon which BGS bases its claims against SSO and, accordingly, these claims "relate back" to those claims. However, BGS argues that neither SSO's original counterclaim nor BGS's amended complaint made any mention of the SINSO data and, therefore, this claim does not relate back.

As noted above, under Rule 15(c) of the Federal Rules of Civil Procedure, an amendment to a pleading "relates back" to the date of the original pleading if, among other requirements, the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading. Fed.R.Civ.Pro. 15(c).[9] BGS encourages an extremely narrow reading of this requirement that would essentially find that it could only be

---

[9]BGS concedes that, if the proposed amendment relates back to the date of SSO's original counterclaims filed on January 6, 2011, SSO's claim regarding conversion of the SINSO data "arguably" might slip under the limitations wire. Thus, at this point, given that no facts have been alleged to the contrary, the Court will assume that, should this claim relate back, the statute of limitations for this claim would not have expired when SSO's original counterclaims were filed on January 6, 2011.

fulfilled if SSO's original counterclaim specifically mentioned the SINSO data.  However, the Sixth

Circuit has repeatedly stated that "the thrust of Rule 15 is to reinforce the principle that cases should

be tried on their merits rather than the technicalities of pleadings." *Miller v. American Heavy Lifting*

*Shipping*, 231 F.3d 242, 248 (6th Cir. 2000)(citations and internal quotations omitted).  Specifically,

Rule 15(c) "is based on the notion that once litigation involving particular conduct or a given

transaction or occurrence has been instituted, the parties are not entitled to the protection of the

statute of limitations against the later assertion by amendment of defenses or claims that arise out

of the same conduct, transaction, or occurrence as set forth in the original pleading."  *Id*., quoting

*Brown v. Shaner*, 172 F.3d 927, 932 (6th Cir. 1999).  Thus, an amendment adding a new legal theory

arising out of the same transaction of occurrence or that alleges added events leading up to the same

injury are permissible.  *Miller*, 231 F.3d at 248-249 (citations omitted).  As noted by the United

States Supreme Court, "Rule 15(c)(2) relaxes, but does not obliterate, the statute of limitations;

hence relation back depends on the existence of a common "core of operative facts" uniting the

original and newly asserted claims."  *Mayle v. Felix*, 545 U.S. 644, 659 (2005)(citations omitted).

Given this background, BGS's narrow interpretation of Rule 15(c) seems unwarranted.

Although SSO's original counterclaim does not specifically mention the SINSO database, it does

contain allegations regarding BGS's use of SSO's Point of Sale system and database and that BGS

sent emails to actual and prospective customers of SSO.  According to SSO's proposed amended

counterclaim/third-party complaint, SSO's SINSO Point of Sale database included contact

information (including email addresses) for more than 42,000 contacts, including customers and

Federal Firearms License-holding firearm dealers.  Although insufficient information is given

regarding whether the "SINSO" database and SSO's Point of Sale database are the same thing, there

32

are sufficient allegations in SSO's original counterclaim that would put BGS on notice that litigation involving its use of SSO's data, including SSO's customer and dealer email lists, had been instituted. Thus, the Court finds that SSO's counterclaim against BGS alleging the conversion of SSO's SINSO data relates back to its original counterclaim and is, therefore, timely.

However, to the extent that SSO seeks to file a third party complaint bringing a claim against McClanahan and Wells alleging conversion of SSO's SINSO data, the "relation back" to SSO's original counterclaim permitted by Rule 15(c) is not available.  Under well-established Sixth Circuit precedent, "an amendment which adds a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010)(quoting *In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1449 (6th Cir.1991)(quoting *Marlowe v. Fisher Body*, 489 F.2d 1057, 1064 (6th Cir.1973)).  As in Asher, SSO, as third-party plaintiff, does not seek to change the name of the third-party defendant in an effort to correct a previous mistake as to that party's identity, but instead, seeks to circumvent the statute of limitations, adding new claims against new parties. *Asher*, 596 F.3d at 319.  This is not permitted under Rule 15(c).  Because the face of SSO's third-party complaint alleges that the conversion of the SINSO data occurred in early 2009 and fails to allege any facts suggesting that, in the exercise of reasonable diligence, SSO could not have discovered the conversion of the SINSO data at that time, this claim does not relate back to SSO's original counterclaim filed on January 6, 2011 and, therefore, was untimely when SSO filed its proposed amended third-party complaint on October 19, 2011.  Accordingly, to the extent that SSO's proposed amended third-party complaint seeks to bring claims alleging conversion of the SINSO data against Wells and McClanahan, these claims are time-barred and would not survive a motion to dismiss.

For these reasons, SSO's motion for leave to file a counterclaim/third-party complaint is denied to the extent that it seeks to bring claims against BGS, Wells and McClanahan for conversion of the www.budsgunshop.com website.  SSO's motion is also denied to the extent that it seeks to bring a third-party claim against Wells and McClanahan for conversion of the SINSO data.  However, SSO will be permitted to proceed with its proposed claims against BGS, Wells and McClanahan for conversion of the www.SecuritySafeOutlet.com website, as well as its proposed claim against BGS for conversion of the SINSO data.

2.   <u>Aiding and Abetting Conversion Against McClanahan (Count 7) and Wells (Count 8)</u>

SSO's proposed amended counterclaim/third-party complaint brings claims against McClanahan (Count 7) and Wells (Count 8) for aiding and abetting the conversion alleged in Count 6.  Although SSO first argues that these are not proper third-party claims, for the reasons set forth more fully above, the Court has already determined that these claims are proper third-party claims under Rule 14.  In addition, to the extent that BGS argues that the aiding and abetting conversion claims are preempted by federal copyright law and KUTSA, these arguments also fail at this stage of the litigation, for the reasons set forth more fully above.  BGS further argues that SSO purports to forge a new legal cause of action by way of this claim, as it has been unable to find a case in which a Kentucky state court has recognized a civil action for aiding and abetting conversion.  In fact, neither has this Court.  Regardless, as these claims are against Wells and McClanahan - not BGS - whether or not Kentucky recognizes a cause of action for aiding and abetting conversion would perhaps be better addressed on a motion to dismiss filed by Wells and/or McClanahan once they have officially been made parties in this case.  Accordingly, the Court finds that, at this time, this

argument is premature.

In addition, BGS also argues that, like the statute of limitations for the conversion claims, the statute of limitations for any aiding and abetting conversion claims would be subject to the two-year limitation period under KRS § 4213.125.  This argument is well taken.  For the reasons stated above, the Court finds that, to the extent that SSO's proposed claim alleges aiding and abetting of conversion of the www.budsgunshop.com website and the SINSO data, these claims are untimely.  Based on the facts alleged by SSO, in the exercise of reasonable diligence, SSO should have discovered the basis for its claim of conversion of the www.budsgunshop.com website, including the related aiding and abetting conversion claims, in 2007.  Thus, the two-year statute of limitations for this claim provided by KRS § 413.125 expired in 2009.  In addition, as because the face of SSO's complaint alleges that the aiding and abetting of conversion of the SINSO data occurred in early 2009 and fails to allege any facts suggesting that, in the exercise of reasonable diligence, SSO could not have discovered the aiding and abetting of conversion of the SINSO data at that time, this claim does not relate back to SSO's original counterclaim filed on January 6, 2011 and, therefore, was untimely when SSO filed its proposed amended third-party complaint on October 19, 2011.  Because SSO's proposed claims alleging aiding and abetting conversion of the www.budsgunshop.com website and the SINSO data are untimely and would not survive a motion to dismiss, SSO's motion for leave to file a third-party complaint is denied to the extent that it seeks to bring these claims against Wells and McClanahan.  However, the claims of aiding and abetting conversion of the www.SecuritySafeOutlet.com website remains.


      3.    <u>Breach of Fiduciary Duty (Count 9) and Diversion of Corporate Opportunity</u>

<u>(Count 10) against Wells; Aiding and Abetting Breach of Fiduciary Duty</u>
<u>Against BGS and McClanahan (Count 11)</u>

Next, SSO's proposed third-party complaint brings claims against Wells for breach of fiduciary duty (Count 9) and diversion of corporate opportunity (Count 10).  SSO alleges that, as a shareholder, director and officer of SSO, Wells owed fiduciary duties of loyalty and good faith to SSO until April 30, 2009, the date on which Johnson and Wells executed the Stock Redemption Agreement under which Ace Johnson, LLC (an entity solely owned by Johnson) became the owner of all shares of SSO [DE #62-2].  SSO alleges that Wells began preparing to create BGS in 2006 and did not inform Johnson of his intentions to create BGS until after the Stock Purchase Agreement, pursuant to which Johnson purchased a minority interest in SSO, was executed on January 1, 2007 [*Id.*].  SSO further alleges that, upon learning of Wells's intention to create BGS, Johnson objected and that, in response to this objection, Wells represented to Johnson that the formation of BGS would not change SSO's business operations, including SSO's use of the www.budsgunshop.com website [*Id.*].  BGS was officially created in 2007 [*Id.*].  SSO alleges that Wells's preparations and formation of BGS, an entity which would compete with SSO; his failure to disclose these preparations and intentions to SSO; his misrepresentation to SSO that control and use of the www.budsgunshop.com website would remain with SSO; and his diversion of SSO's corporate assets (including the www.budsgunshop.com website, the email database associated with that website, and SSO's SINSO data) to BGS all breached his fiduciary duty to SSO [*Id.*]. With respect to its diversion of corporate opportunity claim, SSO alleges that the internet sales through the www.budsgunshop.com website were a corporate opportunity belonging to SSO and that, to the extent that Wells "spun off" the website and internet sales through that website to BGS in 2007, he

36

diverted that corporate opportunity [*Id.*].

However, BGS argues that the April 30, 2009 Stock Redemption Agreement between Wells, SSO, Johnson and other related parties contains a broad release provision releasing Wells from these claims. Specifically, the release provision provides that SSO, Johnson and other parties:

> hereby release, relinquish, and forever discharge Wells from any and all claims, liabilities, obligations, causes of action, suits, debts, covenants, contracts, controversies, agreements, warranties, representations, promises, damages, understandings, demands and claims, of whatever kind and nature, known and unknown, now existing or hereafter arising, which Releasors now have or have had or may have had or will have against Wells, whether in law or equity, arising out of or related to any event(s) occurring on or prior to [April 30, 2009].

[DE #69-1].[10]

SSO does not dispute that the events forming the basis of its breach of fiduciary duty and diversion of corporate opportunity claims occurred on or prior to April 30, 2009 and are, therefore, covered by the release. Rather, SSO argues that, at the time the parties entered into the Stock Redemption Agreement, SSO did not know that Wells had "spun off" the customer email list such that SSO could no longer use it or that BGS has instructed Denninghoff to copy SSO's SINSO data from SSO's server. It is true that, "[u]nder Kentucky law, like most jurisdictions, a release obtained by misrepresentation or fraud is unenforceable." *In re Sallee*, 286 F.3d 878, 898 (6th Cir.

---

[10]As noted by BGS, SSO's proposed amended counterclaim/third-party complaint specifically references the April 30, 2009 Stock Redemption Agreement, thus the Court may properly consider the release provision contained therein in determining whether SSO's proposed breach of fiduciary duty and diversion of corporate opportunity claims are futile. *Comm. Money Ctr. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335-336 (6th Cir. 2007)("[W]hen a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment."). SSO's suggestion that the fact that its proposed amended counterclaim/third-party complaint has not yet been filed means that the Stock Redemption Agreement has not yet been "pled" and is not yet properly before the Court does not have merit.

2000)(citations omitted). *See also Humana Inc. v. Blose*, 247 S.W.3d 892, 895 (Ky. 2008).

Here, notwithstanding the clear and broad language of the release, given Wells's heightened obligations to SSO as a fiduciary - in addition to the fact that this is a claim against Wells, who has not yet been made a party - at this point, the Court believes that it would be premature to rule on whether SSO's breach of fiduciary duty and diversion of corporate opportunity claims are covered by the release. Thus, the Court will allow SSO to proceed with these claims against Wells at this time. In addition, as BGS's main objection to SSO's aiding and abetting breach of fiduciary duty claims against BGS and McClanahan is that SSO's breach of fiduciary duty claim against Wells is futile due to the release, SSO will be permitted to proceed with those claims as well. For all of these reasons, SSO's motion for leave to file an amended counterclaim/third-party complaint bringing these claims is granted.

Finally, BGS argues that permitting SSO to add these proposed fiduciary duty-based claims at this stage of the litigation would cause undue prejudice to SSO, Wells and McClanahan. According to BGS, "SSO sat on its hands for several years in connection with these claims while accepting BGS's money and enjoying a business relationship with a rapidly growing company. SSO then sat on its hands for the entire discovery period in this case before asserting claims against Wells, McClanahan, and BGS relating to matters known well before the inception of this lawsuit" [DE #69]. However, in connection with its Order permitting BGS to file a second amended complaint against SSO and Denninghoff, the Court has already determined that the discovery deadlines will need to be extended in this case. Thus, any prejudice to BGS, Wells and McClanahan resulting from permitting SSO to file its proposed breach of fiduciary duty-based claims may be addressed by permitting time for additional discovery on SSO's claims.

4.     Expansion of Breach of Contract Claim (Count 1)

BGS also objects to the proposed expansion of SSO's breach of contract claim alleged in Count 1 of its proposed amended counterclaim/third-party complaint.  SSO's original breach of contract claim alleges that BGS's promise that it would not engage in retail sales in competition with SSO was made in consideration of Johnson's agreement to purchase Wells's interest in SSO and SSO's agreement to continue to fulfill www.budsgunshop.com internet orders with SSO inventory at SSO's cost and below cost [DE #13].  SSO alleges that BGS has breached this agreement by engaging in retails sales in competition with SSO.

In its proposed amended counterclaim/third-party complaint, SSO seeks to expand this claim by also asserting it against Wells and McClanahan.  BGS argues that this expanded claim is rendered futile by the integration clause in the April 30, 2009 Stock Redemption Agreement, which provides that "[a]ll prior negotiations and agreements between Wells and Buyers are superseded by this Agreement, and there are no representations, warranties, understandings or agreements between the parties other than those expressly set forth herein" [DE #69-1 at ¶12.06].  As the Stock Redemption Agreement does not contain any representations that BGS will not engage in retail sales in competition with SSO, BGS argues that SSO is prohibited from relying on any alleged promise made prior to this Agreement.  Therefore, according to BGS, SSO's proposed expanded claim is futile.

SSO does not address whether the integration clause of the Stock Redemption Agreement renders its expanded breach of contract claim futile.  As the contractual language is clear, the Court finds that this provision, in conjunction with ¶ 4.02 of the Agreement wherein Johnson specifically acknowledges that, in undertaking the transaction contemplated by the Agreement, he is not relying on any representations or warranties from Wells or SSO, other than those contained in the

39

Agreement, renders SSO's claim futile.  Accordingly, SSO's motion for leave to file a third-party complaint is denied to the extent that it seeks to assert its breach of contract claim against Wells and McClanahan.

5.  <u>Misappropriation of Trade Secrets in Violation of KRS § 365.880, *et seq.*
Against BGS, Wells and McClanahan (Count 12)</u>

SSO's proposed claim for misappropriation of trade secrets arises from SSO's allegations that, individually and on behalf of BGS, McClanahan accessed Jennifer Arnett's email account by logging on to her www.SecuritySafeOutlet.com email account and identifying himself as Arnett [DE #62-2].  SSO further alleges that, after doing so, McClanahan read emails sent to Arnett and other SSO employees and disseminated email messages between Arnett and third parties to Wells and another individual, including communications between SSO and its sales representatives, SSO's tax returns and SSO's daily sales data [*Id.*].    SSO alleges that by accessing Arnett's www.SecuritySafeOutlet.com email account, BGS, Wells and McClanahan "acquired and used confidential and proprietary information belonging to SSO, including but not limited to communications between SSO and its vendors or suppliers, daily sales information, and tax returns, all of which had value to SSO by virtue of the fact that the information contained therein was not generally known to, nor readily ascertainable by, other persons that could obtain economic value from its disclosure or use" [*Id.*].   According to SSO, this information was contained within a password-protected email account belonging to SSO and was the subject of continuous efforts that were reasonable under the circumstances to maintain its secrecy [*Id.*].

In *BDT Products, Inc. v. Lexmark Intern., Inc.*, 274 F.Supp.2d 880 (E.D.Ky. 2003), aff'd, 124 F. App'x 329 (6th Cir. 2005), the court summarized the elements of a trade secret misappropriation

40

claim under KUTSA as follows:

> Plaintiffs' third cause of action amounts to a suit under the Kentucky Uniform Trade Secrets Acts ("KUTSA"), KRS § 365.880 *et seq*.  "In order to prevail on a breach of the Uniform Trade Secrets Act claim, Plaintiffs must present evidence which satisfies a two prong inquiry.  First, they must present evidence which indicates that the information they seek to protect qualifies as a protectable trade secret." *In re Dippin' Dots Patent Litigation*, 249 F.Supp.2d 1346 (N.D.Ga.2003)(citing *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F.Supp.2d 784, 794 (W.D.Ky.2001)).  "To show the information is entitled to protection, Plaintiffs must put forward evidence demonstrating that the information (1) has independent economic value, (2) is not readily ascertainable by proper means, and (3) was the subject of reasonable efforts to maintain its secrecy." *Id*. (citing KRS § 365.880)...

> But, of course, it is not enough merely to show that the information is entitled to protection. Rather, Plaintiffs must also show that the protected information has been misappropriated. "To prove misappropriation, Plaintiffs must show that the trade secret was acquired by improper means, was disclosed improperly, or was used by someone without proper consent." *Id*. (citing KRS § 365.880).

*BDT Products, Inc*., 274 F. Supp. 2d at 889-890 (E.D. Ky. 2003).

BGS argues that SSO's proposed amended counterclaim/third-party complaint fails to allege sufficient facts establishing that the allegedly misappropriated information qualifies as a protectable trade secret and, accordingly, that it would fail to withstand a motion to dismiss under Rule 12(b)(6). To withstand a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face.'" *Twombly*, 550 U.S. at 570.

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  On a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation.  Factual allegations must be enough to raise a right to relief above the speculative level.

*Id.* at 555 (citations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that

the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). *See also Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 467-468 (6th Cir. 2011)(discussing Federal Rule of Civil Procedure 8(a)'s pleading requirements).

In ruling upon a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), all of a plaintiff's factual allegations are presumed true, and the complaint is construed in the light most favorable to the plaintiff. *Riverview Health Institute, LLC*, 601 F.3d at 512. However, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 556. Contrary to SSO's suggestion, these cases do not impose "a pleading standard more exacting than that governing summary judgment." Rather, SSO's proposed amended counterclaim/third-party complaint "must include more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' and instead proffer 'enough facts to state a claim to relief that is plausible on its face." *Ashland, Inc.*, 648 F.3d at 467-468 (quoting *Twombly*, 550 U.S. at 555, 570).

Here, SSO does make a meager effort to go beyond a "formulaic recitation of the elements" of trade secret misappropriation and proffer facts supporting its claim that the allegedly misappropriated information qualifies as a protectable trade secret. For example, SSO alleges that the information misappropriated includes communications between SSO and its vendors or suppliers, SSO's daily sales information and SSO's tax returns, which, according to SSO, have economic value by virtue of the fact that they are not generally known or readily ascertainable. Arguably, such information could be considered valuable to a competitor of SSO, seeking, for example, to learn more information about SSO's sales, profits and its relationships with its suppliers. SSO has also alleged that this information was the subject of reasonable efforts to maintain its secrecy, including

42

that the information allegedly accessed by McClanahan was contained within a password-protected email account belonging to SSO.  Although, as pointed out by BGS, it is possible that *other* copies of documents containing this information were not as carefully protected and were readily ascertainable by proper means, BGS is free to explore these possibilities in discovery and present these arguments to the Court in a later motion for summary judgment.  Regardless, SSO has alleged sufficient facts in support of its trade secret misappropriation claim to withstand a motion to dismiss.  Accordingly, SSO's motion for leave to amend its counterclaim and file its third-party complaint is granted to the extent that it seeks to bring a claim under KUTSA for misappropriation of trade secrets.

> 6.    Unlawful Access of a Computer in Violation of KRS § 434.845 Against BGS, Wells and McClanahan (Count 13)

In Count 13, SSO renews its allegations that BGS, Wells and McClanahan unlawfully accessed Jennifer Arnett's www.SecuritySafeOutlet.com email account, which contained communications between SSO and its vendors or suppliers, SSO's daily sales information and SSO's tax returns, in order to execute a scheme to defraud SSO and/or obtain property by the use of false pretenses.  SSO alleges that these actions by BGS, Wells and McClanahan violate KRS § 434.845, which prohibits the unlawful access to a computer.   BGS argues that this claim is preempted by KUTSA.

Unlike SSO's conversion claim, an examination of this claim reveals that it does seek a remedy for the misappropriation of trade secrets.  Indeed, SSO's allegations focus on the alleged wrongful use of allegedly protected trade secret information that was obtained by improperly accessing Jennifer Arnett's email account.  Thus, SSO's claim arises from the misappropriation of

trade secrets.  Applying the analysis described above in connection with BGS's argument that a portion of SSO's conversion claim is preempted by KUTSA, the Court finds that SSO's claim under KRS § 434.845 is preempted by KUTSA, in accordance with KRS § 365.892.  Accordingly, SSO's motion for leave to amend its counterclaim and file a third-party complaint alleging this claim is denied, as SSO's claim is futile.

## III.    CONCLUSION

For all of the foregoing reasons, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

1.    Defendant SSO's  motion for leave to file an amended counterclaim/third-party complaint [DE #62] is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.    SSO's motion is **GRANTED** with respect to SSO's proposed conversion claim against BGS, Wells and McClanahan related to the alleged conversion of the www.SecuritySafeOutlet.com website and related data; its proposed conversion claim against BGS related to the alleged conversion of SSO's SINSO data; its proposed breach of fiduciary duty claim against Wells; its proposed diversion of corporate opportunity claim against Wells; its proposed aiding and abetting breach of fiduciary duty claim against BGS and McClanahan; and its proposed misappropriation of trade secrets claim against BGS, Wells and McClanahan;

b.    SSO's motion is **DENIED** with respect to SSO's proposed expansion of its breach of contract claim; its proposed conversion claim against BGS, Wells and McClanahan related to the alleged conversion of the

www.budsgunshop.com website and related data; its proposed conversion claim against Wells and McClanahan related to the alleged conversion of SSO's SINSO data; its proposed aiding and abetting conversion claim against Wells and McClanahan related to the alleged conversion of the www.budsgunshop.com website and related data and SSO's SINSO data; and its proposed claim of unlawful access of a computer in violation of KRS §434.845 against BGS, Wells and McClanahan; and

2.     Within ten (10) days from the date of this Opinion & Order, SSO shall tender a revised amended counterclaim/third-party complaint in conformity with this Opinion & Order, deleting the following claims from its previously tendered amended counterclaim/third-party complaint:

    a.     SSO's proposed expansion of its breach of contract claim (Count 1) adding breach of contract claims against Wells and McClanahan;

    b.     Conversion (proposed Count 6) of the www.budsgunshop.com website and related data against BGS, Wells and McClanahan;

    c.     Conversion (proposed Count 6) of SSO's SINSO data against Wells and McClanahan;

    d.     Aiding and abetting conversion against McClanahan (proposed Count 7) and Wells (proposed Count 8) of the www.budsgunshop.com website and related data and SSO's SINSO data;

    e.     Unlawful access of a computer in violation of KRS §434.845 (proposed Count 13) against BGS, Wells and McClanahan.

This May 23, 2012.



Signed By:

*__Karl S. Forester__*  $KSF$

**United States Senior Judge**